UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | NO. 1:06-CR-00111 |
|  | : |  |
|  | : |  |
|  | : |  |
| v. | : |  |
|  | : | **OPINION AND ORDER** |
|  | : |  |
|  | : |  |
| STEVEN E. WARSHAK, et al. | : |  |
|  | : |  |

This matter is before the Court on the following motions:
Defendants Steven Warshak, Berkeley Premium Nutraceuticals
("Berkeley") and TCI Media's Motion for Judgment of Acquittal or
for New Trial (docs. 405, 331), the government's Response (doc.
440), and Defendants' Reply (doc. 452); Defendant Harriet Warshak's
Motion for Judgment of Acquittal or for New Trial (doc. 395), the
government's Response (doc. 441), and Defendant's Reply (doc. 469);
Defendant Paul Kellogg's Motion for Judgment of Acquittal or for
New Trial (doc. 395), the government's Response (doc. 439), and
Defendant's Reply (doc. 453); Defendant Steven Pugh's Motion for
Judgment of Acquittal (doc. 400) and the government's Response
(doc. 438); Defendants Steven Warshak, Berkeley and TCI Media's
Motion to Vacate Preliminary Order of Forfeiture (doc. 419), and
the government's Response (doc. 430); Defendants Steven Warshak,
Berkeley, and TCI Media's Motion to Set Aside Forfeiture Verdicts
(doc. 413), the government's Response (doc. 443), and Defendants'

Reply (doc. 459); Defendant Steven Warshak, Berkeley, and TCI Media's Motion for New Trial on All Forfeiture Issues (doc. 414), the government's Response (doc. 443), and Defendants' Reply (doc. 458); and Defendant Harriet Warshak's Motion to Set Aside Forfeiture Verdicts or for New Trial on All Forfeiture Issues (doc. 415), and the government's Response (doc. 449).

For the reasons indicated herein, the Court denies all of Defendants' motions.

**I.  Background**

On February 25, 2008 the jury returned guilty verdicts as to four of the individual and two of the corporate Defendants in this case, thereby finding the government had proven beyond a reasonable doubt a massive fraud scheme involving false representations to consumers, numerous fraudulent "autoship" charges to consumer credit cards for products the consumers did not order, money laundering, schemes to conceal transaction abnormalities from banks, and obstruction of two federal agency proceedings.  The verdicts on 101 counts and forfeiture charged in the Indictment came after a six-week long trial in which at least eight very capable lawyers defended their clients strenuously, in which the government presented some ninety different witnesses, and after a pretrial process in which discovery issues and the government's conduct in bringing the case were challenged and briefed extensively (docs. 73, 96, 97, 157, 180, 225, 247).

2

Subsequent to the guilty verdicts, the Court held forfeiture proceedings as to property the government alleges bears relation to the fraud scheme and money laundering. The jury found a nexus or connection between all such property and the criminal activity (docs. 397, 389). The Court therefore entered a preliminary Order of forfeiture and asked the parties to prepare for a hearing on May 14, 2008, at which time it would hear the parties' positions on exactly what portions, if any, of the assets should be forfeited to the government (docs. 418, 420, 425). Defendants now challenge such preliminary Order as premature (doc. 419).

The majority of Defendants' pending motions, however, challenge the validity of both the guilty verdicts and the jury's forfeiture findings. The same standards of review apply to all of the motions, so the Court finds it appropriate to review such standards from the outset.

Each of the motions challenging the guilty verdicts do so under two theories, first, that the evidence was insufficient to support the guilty verdicts. Under such theory, the applicable rule, Fed. R. Crim. P. 29, poses a very heavy burden on Defendants. United States v. Owens, 426 F.3d 800, 808 (6th Cir. 2005). After viewing all evidence in the light most favorable to the prosecution, the Court must determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt (Id.). The Court's task in the context of these present

motions, therefore, is to review the essential elements of each crime, and to determine whether the evidence at trial was sufficient for a rational jury to find each element beyond a reasonable doubt.

Defendants' second theory is that the guilty verdicts were against the manifest weight of the evidence, thus justifying a new trial under Fed. R. Crim. P. 33.  Defendants can prevail under this theory only where the evidence preponderates heavily against the verdict.  United States v. Hughes, 505 F.3d 578, 592 (6th Cir. 2007).  The Court's task in relation to this challenge, therefore, is to review the evidence and to determine whether such evidence so strongly militates against the verdict that the Court is compelled to grant a new trial.

Defendants Warshak, BPN and TCI next raise specific issues as to the government's closing argument and references to the grand jury, which arose after the first phase of the trial. The Court will address such issues in Part III of this Order.

Finally, Defendants Steven Warshak, Berkeley, TCI, and Harriet Warshak similarly challenge the jury's forfeiture findings under the same theories that the verdicts were not rationally supported and were against the manifest weight of the evidence. The government argues that forfeiture is a part of the sentence, so no new trial can be granted on forfeiture absent the granting of a new criminal trial.  The Court finds the entire inquiry premature,

as it has yet to determine how much, if any, of the assets the jury found a nexus to exist with criminal activity, are subject to forfeiture. However, out of an abundance of caution, the Court will briefly address Defendants' arguments as to forfeiture in Part IV of this Order. The Court will devote further attention to the question of forfeiture at and subsequent to the upcoming May 14, 2008 hearing.

## II. Defendants' Motions for Judgment of Acquittal and for New Trial

Defendants ask the Court to overturn the jury's verdict and to grant them a new trial on the following grounds because in their view, the evidence is insufficient to sustain the verdict and the evidence preponderates against the verdicts. The Court will address Defendants' arguments count by count.

### A. Count 1, Conspiracy

The jury found Steven Warshak, Harriet Warshak, and Berkeley guilty as charged in Count 1 of the Indictment, for conspiring to commit mail fraud, wire fraud, and/or bank fraud (docs. 1, 373, 375, 385). As the Court instructed the jury, the essential elements necessary to convict a defendant of conspiracy must be proven beyond a reasonable doubt, and they are 1) that two or more persons made an agreement to commit the crimes of mail fraud, wire fraud, and/or bank fraud; and 2) that the defendant knew the unlawful purpose of the agreement and joined it wilfully,

5

with the intent to further the unlawful purpose (doc. 371).

Defendants Steven Warshak and Berkeley argue as they did at trial that Berkeley experienced explosive growth and they made attempts to manage such growth and remedy mistakes (doc. 331). Defendants frame the case as not one involving criminal intent, but mere growing pains (Id.). Harriet Warshak argues that she merely "hit the button" to process credit card transactions, but that she was not privy to email conversations with the rest of Berkeley employees (doc. 398). She further argues that although testimony showed that she signed merchant bank applications, there was no evidence that she knew what she was signing or even that she had read them (Id.).

The government responds that Defendants' company growth claims are arguments and not evidence, which offer no valid basis for a Rule 29 motion, and fail to show that the weight of the evidence goes against the jury's verdicts (doc. 440). Specifically as to Count 1, the government emphasizes that it presented the testimony of five former officers or employees of Berkeley, all of whom gave detailed testimony about the conspiracy, and all of whom have entered pleas of guilty to the Count 1 conspiracy charge (Id.). All five testified that Berkeley's continuity program entailed enrolling customers automatically, without disclosure, into a program in which the customers were charged and shipped products they did not order (Id.).

6

Former chief information officer Jim Teegarden testified that later disclosures of continuity were drafted to be intentionally misleading, and that he fabricated false advertising claims under Steve Warshak's direction concerning customer satisfaction and product results (Id.). Defendants stipulated at trial that Stanford and Harvard University medical schools had no admission or faculty records for the names of doctors that Berkeley's advertising claimed developed their product Enzyte (Id.). Teegarden further testified that Warshak directed a policy to avoid giving customers refunds or credits for unauthorized charges (Id.). Former Berkeley President Greg Cossman testified that Steve Warshak directed that money-back guarantees made in advertising not be honored, and that complaining customers were directed to a fictitious director of customer care (Id.).

Several of the witnesses testified that because of high chargebacks to Berkeley's merchant bank accounts due to unauthorized charges and the policy against refunds, Steve Warshak directed a number of schemes to manipulate the chargeback ratio (Id.).[1]  Cossman and Teegarden testified that it was crucial to manage the chargeback ratio because high chargeback ratios could

_____

[1] "Chargebacks" result when a consumer disputes a charge on their credit card and the bank gives the consumer a credit of the charge.  Testimony in the case established that banks monitored the ratio of chargebacks to overall transactions as an indicator of fraud.  Witnesses testified that if the ratio of chargebacks to transactions exceeded one percent, the company's ability to continue the processing of credit cards would be put at risk.

mean the end of credit card processing and therefore the end of Berkeley (Id.).  Further testimony of Cossman, Teegarden, former chief financial officer Mike Wagner, and former vice president of sales and sales manager Shelley Kinmon outlined several different methods used to manipulate the ratio and therefore allow for credit card processing to continue, among them: splitting charges (referred to as double, triple, or quadruple dinging), charging and crediting consumer credit cards with small amounts, and massive charging of nominal amounts to Steve Warshak's personal credit cards (Id.).

The government argues that the above evidence shows the there was overwhelming evidence to support the jury's verdict finding a conspiracy to commit mail fraud, wire fraud, and/or bank fraud.  The Court agrees.  Notwithstanding the Defendants' arguments that the company grew out of control and made good faith efforts to comply with the law, the Court finds no question that the evidence at trial supported the verdict and withstands the instant challenge.  The testimony of the former Berkeley officers and employees shows the jury could rationally find that Defendants knowingly agreed to effectuate a complex scheme to defraud consumers, by use of the mails and wires, and they did so knowing they stood to profit financially.  Defendants' argument that the jury's conclusion regarding the conspiracy charges is against the manifest weight of the evidence, thus meriting them a new trial,

similarly falls flat.

As for Harriet Warshak's argument that the jury lacked evidence to find her guilty, the Court finds well-taken the government's position that former employee Shelley Kinmon's testimony provides an adequate basis for the jury's conclusion (doc. 441).  Kinmon testified that Steve Warshak put Harriet Warshak in charge of processing continuity charges because she could be trusted, that Harriet Warshak processed numerous transactions to manipulate the chargeback ratio, and that Harriet Warshak attended regular staff meetings at which management discussed the chargeback ratio.  Testimony of witnesses Greg Cossman, Mike Wagner, and Sam Grote established that Harriet Warshak signed merchant processing agreements that falsely stated she owned the company.  The jury reasonably inferred that Harriet Warshak knew what she was signing, that she made the false statement because Steve Warshak's application as the true owner would be rejected, and that she needed to sign so the company could keep processing continuity charges.  Harriet Warshak's argument that she merely pushed a button is not evidence that strongly militates against the jury's conclusion that she knew what was going on at the company, and actively participated with the intent to keep the continuity scheme going.

**B.  Counts 2-13, Mail/Wire Fraud**

The jury found Steven Warshak and Berkeley guilty of mail

and wire fraud (docs. 373, 385).  Mail and wire fraud are established by essentially the same elements.  <u>United States v. Crossley</u>, 224 F.3d 847, 857 (6th Cir. 2000), <u>United States v. Bibby</u>, 752 F.2d 1116, 1126 (6th Cir. 1985).  The Court instructed the jury in this case that in order to find guilty any of the Defendants charged with wire fraud, the government had to prove 1) that the Defendant knowingly participated in a scheme to obtain money by false pretenses, 2) that the scheme included a material misrepresentation of a material fact, and 3) that the Defendant used wire, radio, or television communications or caused another to use such communication in interstate commerce, in furtherance of the scheme (doc. 371).[2]

The government proffered ten consumer witnesses regarding counts 2-13, who all described how they ordered a Berkeley product or responded to a free trial, and thereafter were charged without their authorization for products they did not order (doc. 440). Eleven other consumers, for whom charges were not made in the Indictment, similarly testified (<u>Id</u>.).  The government argues this is compelling evidence sufficient to lead a reasonable juror to conclude Steve Warshak and Berkeley acted with intent to deceive

---

[2]The Court's instructions as to mail fraud indicated the government had to prove each of the following elements beyond a reasonable doubt: 1) that Defendant knowingly devised a scheme to defraud, 2) that the scheme included a material misrepresentation or a concealment of a material fact, 3) that the Defendant had intent to defraud, and 4) that Defendant used, or caused to be used, the mails in furtherance of the scheme (doc. 371).

these consumers by way of false representations (Id.).

Defendants attack the testimony of each consumer witness arguing there are alternative ways to view such testimony, that the customers' respective orders and complaint letters do not constitute the requisite use of mails in furtherance of the scheme, and that several of the customers received disclosure regarding continuity over the internet (doc. 331). The Court has reviewed such arguments and finds the government's position well taken that the jury's guilty verdicts can be rationally supported by evidence proffered at trial. Here, Berkeley shipped through the mails products to each of the consumers that the consumers did not order. Clearly, the evidence showed that disclosures of the continuity program shifted constantly, were often buried or not evident, and the jury believed this showed an intent to defraud as opposed to a mistaken practice by a growing company.

Although the government does not argue the point in its Response, the Court further notes that Defendants' business model included using interstate telephone and computer communications, as well as television advertising, to reach its target consumers. The testimony of many of the consumers could be viewed by the jury to show Berkeley had a practice of not disclosing a material fact in its communications: that Berkeley was enrolling the consumers into the continuity program. Consequently, the Court similarly cannot find the jury's verdict irrational as to the wire fraud charges.

Finally, the Court cannot find the jury's verdicts as against the manifest weight of the evidence.  The jury here clearly weighed the evidence, assessed the credibility of the consumers, and arrived at verdicts that the Court is not compelled to set aside for a new trial.  Taken together, the Court is convinced the cumulative evidence shows the jury had an adequate and rational basis to arrive at its verdicts.

## C.  Bank Fraud

The jury found Defendants Steve and Harriet Warshak guilty of bank fraud.  The Court instructed the jury that in order to find Defendants guilty of such charge, they must find beyond a reasonable doubt 1) that Defendants knowingly executed a scheme to defraud the named bank, or knowingly executed a scheme to obtain money under the bank's control by means of false or fraudulent pretenses, 2) that the schemes were substantially similar to those charged in the Indictment, 3) that the schemes included a material misrepresentation or concealment of material fact, 4) that the defendant had the intent to defraud, and 5) that the institution was federally insured (doc. 371).  Relying on <u>United States v. Reaume</u>, 338 F.3d 577, 581 (6th Cir. 2003), and <u>United States v. Everett</u>, 270 F.3d 986, 991 (6th Cir. 2001), the Court further instructed the jury that the government could establish Defendants' intent to defraud by proving Defendants' actions exposed a bank to risk of loss, or caused the bank to transfer funds that were in its

possession or control (docs. 343, 371).

Defendant Steven Warshak argues the evidence at trial showed that his actions in splitting transactions to reduce the chargeback ratio were governed by Visa/Mastercard company rules, which are private rules as opposed to the bank fraud statute (doc. 331).  He further argues that the banks had reserves established by sales revenues that protected them from any real risk of loss, and that all chargebacks and excessive chargeback fees were paid from Berkeley's operating account (Id.).  Steve Warshak argues that his company's relationship with the banks was profitable for the banks, and that the splitting of transactions and the charging of multiple small transactions in fact created more income for the banks, which profited from additional transaction fees (Id.).  Harriet Warshak argues that because she was acquitted on the false statement to bank charges, the jury's verdict would logically have to rest on the manipulation of charge-back ratios (doc. 398).  She further argues, as she did in relation to the conspiracy charge, that she merely "pushed the button" as a data entry person (doc. 469).  Such evidence, in her view, is insufficient to support the jury's verdict (Id.).

The government responds that Cossman's testimony established that the false inflation of transactions was designed to fraudulently lower the chargeback ratio so the business could continue processing credit cards (doc. 440).  Moreover, VISA

13

Director of Payment System Risk Hector Rodriguez testified about risk of loss to the merchant bank from chargebacks (<u>Id</u>.).

The Court again finds, taking all inferences in favor of the prosecution, that the jury's verdict was rationally supported by the evidence placed before it.   The Court finds it clear that Defendants' schemes in falsely inflating transactions caused the banks to maintain their relationship with Berkeley, and thus caused the banks to transfer funds out of their possession.   Although Defendant Steven Warshak characterizes the chargeback ratio manipulation as governed by private rules, the jury made the rational connection that such rules were violated so as to allow the company to keep charging customers for products they did not order.   It is no great logical leap for the jury to conclude that this scheme put the banks at risk of loss, that the scheme gave Defendants access to money under the bank's control, and that the false manipulation of the ratio was material to the scheme.   As already discussed above, the jury made a reasonable inference that Harriet Warshak, both in entering continuity charges and in signing false statements on processor applications, knowingly and intentionally participated in the scheme.   The elements of bank fraud and false statement to bank are distinct, and the Court rejects Harriet Warshak's argument that her acquittal on the latter charges necessarily excludes consideration of the false bank

14

applications as a component to bank fraud.[3]  The Court concludes that the jury's verdict as to both Steve and Harriet Warshak on the bank fraud count was rationally supported by the evidence, and was not contrary to the manifest weight of the evidence.

### D.  Access Device Fraud

The Court instructed the jury that the elements of access device fraud are 1) Defendant effected transactions with access devices (credit cards) issued to other persons, 2) Defendant acted knowingly, wilfully, and with the specific intent to defraud, 3) Defendant obtained through those transactions payment totaling at least $1,000.00 in a one-year period, and 4) Defendant's conduct affected interstate commerce (doc. 371).  After considering the evidence, the jury found Steve Warshak and Berkeley guilty as charged in Count 29, for access device fraud (docs. 373, 385).

Defendants argue the government failed to prove either the $1,000.00 jurisdictional requirement, or that Defendants effected the transactions with an intent to defraud (doc. 331). The government responds that Defendants' arguments are wholly without merit (doc. 440).  The Court agrees.  Teegarden's testimony at trial established that under Warshak's direction he programmed

---

[3] The Court instructed the jury that to find Defendants guilty of false statement to bank the jury had to find beyond a reasonable doubt that the false statement actually influenced the bank to open a merchant account on behalf of the company for which the application was submitted.  There is no such requirement to reach a guilty verdict of bank fraud.

the database to charge two thousand consumers for continuity, although the consumers were not aware they would be charged (<u>Id</u>.). This testimony alone meets the jurisdictional requirement.

Moreover, Jeff Black, a former Berkeley computer programmer, testified about six thousand charges of $4.50 each, processed in late November 2003 (<u>Id</u>.). Finally, former chief financial officer Mike Wagner, and Berkeley programmer analyst Moien Malick testified they processed 5,234 unauthorized charges of one dollar to customers' credit cards (<u>Id</u>.). Even should Defendants have issued complete refunds in relation to this last set of charges, this does not eliminate the fact that Defendants obtained the jurisdictional amount, and they did so as to falsely manipulate the chargeback ratio. Such action can be viewed rationally as evidence of intent to defraud. In addition, the Court finds adequate evidence in the repetitive nature and scope of Defendants' actions, and in the testimony of the cooperating witnesses, such that the jury could rationally conclude the credit card transactions were not made in good faith, but rather, with intent to defraud. Defendants' arguments to the contrary are unavailing, and the Court finds no basis for acquittal or a new trial as to this count.

### E. Money Laundering

The Indictment charged Defendants Steve Warshak (counts 30, 31, 32-98, 102-106), Harriet Warshak (counts 30, 31, 99-101,

16

107), and Paul Kellogg (counts 30, 31, 96, 97) with three types of money laundering: promotional money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(I), concealment money laundering in violation of § 1956(a)(1)(B)(i), and money laundering in violation of 18 U.S.C. § 1957.  Defendant TCI was also charged with concealment money laundering in counts 57, 58, 60-73, 79, 83, 91-93).  The jury found each Defendant guilty as charged.

### 1. Defendants Warshak and TCI

Defendants Steve Warshak and TCI challenge two elements common to each of these charges, which they argue the government has failed to prove beyond a reasonable doubt: 1) that the transaction involved the proceeds of specified unlawful activity, and 2) that the Defendant know the transaction involved the proceeds of some form of unlawful activity.  As for the first element, Defendants argue that because the government has failed to prove Defendants committed mail fraud, wire fraud, or bank fraud, the government cannot prove they conducted transactions with proceeds of unlawful activity.  This argument fails, as the Court has already determined that the jury's verdicts finding such unlawful activity were rational and not against the manifest weight of the evidence.  The evidence showed a large and profitable consumer fraud scheme, which the jury could easily conclude resulted in proceeds the Defendants concealed or used to further the business.

As for the second element, the Court instructed the jury they could consider that a series of complex, convoluted financial transactions, even in accounts all bearing the same name as a Defendant, were designed with an intent to conceal.  The evidence clearly showed such a series of transactions, and the government's witness, Jerry Simpson, testified they were among the most complex he had ever examined during his thirty-six years doing financial analysis for the F.B.I.  Although Defendants argue that Mr. Simpson improperly testified as to the mental state of Defendants in three times—-the Court agrees with the government that an expert may properly testify that the effect of transactions was to conceal, and that Simpson testified as to the design of the transfers in clarifying his view of the evidence.   To whatever extent, if any, that Mr. Simpson's testimony reached the outer limits of Fed. R. Evid. 704's prohibition of expert opinions as to a Defendant's mental state, the Court finds that his subsequent clarification remedied any prejudice.

Finally, Defendants Steve Warshak and TCI argue that the promotional money laundering count convictions are flawed because the government did not link any financial transaction to the promotion of mail fraud, wire fraud, or bank fraud (doc. 331).  The government responded, and the Court finds well taken, that the payments Steve Warshak made to his mother, sister, and his mother's boyfriend could be viewed as payments to co-conspirators working in

18

the enterprise, and thus could constitute promotional money laundering (doc. 440, <u>citing</u> <u>United States v. Rudisill</u>, 187 F.3d 1260, 1267 (11th Cir. 1999)).

### 2. Defendant Harriet Warshak

Defendant Harriet Warshak argues the evidence showed she received a gift from her son, a check for one million dollars, which she deposited into accounts in her own name (doc. 398). Harriet Warshak argues the evidence shows she was not hiding anything (<u>Id</u>.). In her view, the jury could not rationally view this evidence to support a finding of concealment money laundering, beyond a reasonable doubt (<u>Id</u>.). In fact, relying on <u>United States v. Marshall</u>, 248 F.3d 525 (6th Cir. 2001), she argues that even if the money she received went through previous transactions that had the effect of concealment, such concealment cannot be attributed to her derivative transactions (doc. 469).

Harriet Warshak's argument goes to the final element of Section 1956 money laundering, which requires, as the Court instructed the jury, that Harriet Warshak "knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified activity, in this case, the charged mail fraud, wire fraud or bank fraud schemes" (doc. 371). In her view, the deposit of the one million dollars into an account in her name, and then subsequent deposits into other accounts in her name, shows no

19

intent to conceal or disguise.  The government responds, arguing the point of the money laundering statute requires concealment of the source of the fraud proceeds, and not the concealment of the identity of the Defendant or the transaction itself (doc. 441).

The Court finds <u>United States v. Marshall</u>, 248 F.3d 525 (6th Cir. 2001) inapposite on its facts.  In <u>Marshall</u>, the appellate court, finding no intent to conceal, vacated three money laundering convictions based on Defendant's purchases of a Rolex watch, a tennis bracelet, and expensive wine.  248 F.3d 525, 541-42.  The Defendant in <u>Marshall</u> had already been found guilty of Section 1957 money laundering in setting up a brokerage account using funds from larceny, and Defendant was not appealing such conviction.  <u>Id</u>. at 540.  His appeal targeted his prosecution for subsequent purchases made from funds in the brokerage account.  <u>Id</u>.  The Court noted that money laundering is not a continuing offense, such that each transaction should be analyzed individually under Section 1956, for intent to conceal.  <u>Id</u>.  In finding no intent to conceal, the Court viewed the purchases made with the criminal proceeds as a "few isolated purchases of wearable or consumable items" with a relatively small value in relation to the amount stolen by the Defendant.  <u>Id</u>. at 541.

In this case, the Court finds the deposit of the million dollar check is factually different, and the money laundering prosecution of Harriet Warshak is not based on derivative purchases

20

that she made from a fund of dirty money.  The Court has absolutely no difficulty in accepting that sufficient evidence supports the view that Harriet Warshak knew the money her Son gave her involved fraud proceeds.  After all, she worked for the company and the jury could infer, as already discussed, that she knew about its business model.  The Court finds the question of Harriet Warshak's intent to conceal a closer call, but also concludes the jury could rationally infer that her deposit of the funds into her investment accounts showed an intent to take assets from fraud and to convert them into clean assets more difficult to trace to the original source.

### 3. Defendant Paul Kellogg

Paul Kellogg argues first that the government failed to prove he knew the property involved in the trusts he set up for Steve and Carrie Warshak involved the proceeds of some form of unlawful activity (doc. 395).  He then argues, similarly to Harriet Warshak, above, that the government failed to prove his intent to conceal (Id.).   Kellogg proffers evidence that the Venable law firm took the lead in establishing the trusts, that he was not directly involved with the transfers of monies into the trusts, and that such transfers were not complex or convoluted (Id.).

The government responds that evidence in the record of Kellogg's interaction with the Better Business Bureau as early as October 2002 shows he was fully aware of Berkeley's continuity program, the heart of fraud scheme (doc. 439).   The government

argues the jury properly inferred that Kellogg, as general counsel
for the company, was fully aware of the company's practices (Id.).
The government argues evidence shows Kellogg was party to numerous
communications regarding the establishment of the trusts, was
designated as trustee to one of them, and was present when the
trust documents were signed (Id.).  As for Kellogg's intent, the
government argues that Warshak's financial advisor William Bertemes
testified twice that Kellogg informed him there was a "window of
opportunity" to create the trusts before Steven Warshak became
personally involved in litigation with the Federal Trade Commission
(Id.).  Bertemes testified that the trusts were designed "to
protect Steve's assets before that litigation came out" (Id.).

        The Court finds the jury rationally concluded that
Kellogg knew about the nature of Berkeley's business, and that the
proceeds going into the trust came from unlawful activity.  William
Bertemes' testimony concerning the "window of opportunity" leaves
no doubt about evidence regarding Kellogg's intent to put the
assets out of reach of the Federal Trade Commission.  The jury
rationally concluded that Kellogg intended to make the assets more
difficult to trace to the original source.  Kellogg's argument
that Venable lawyers were more involved in setting up the trusts
and that he did not transfer the money himself are unavailing.
The fact that the government chose not to prosecute possible
unindicted co-conspirators does not detract from the fact that it

22

adequately proffered evidence against Kellogg. The fact that Kellogg did not specifically transfer money does not eliminate the reality that his involvement in establishing the trusts, and in serving as a trustee, made the transactions possible. Kellogg's actions can therefore rationally be viewed as the conducting of financial transactions prohibited by the money laundering statutes.

### F. Misbranding, Count 110

The jury entered a verdict against Berkeley on the misbranding count, which required them to find that a Berkeley officer or agent 1) committed an act which resulted in food being misbranded, 2) while the food (nutritional supplement) was held for sale, and 3) such food was introduced or delivered for introduction into interstate commerce (doc. 371). The jury heard testimony of FDA chemist Heather McCauley and FDA Supervisor Robert J. Moore to the effect that Berkeley's product, Rovicid, was misbranded on the box, in claiming to have ingredients that were not present. Steve Allert, a Berkeley warehouse employee, testified that he repackaged Rovicid originally in boxes identifying it as for prostate health, into boxes for heart health. Allert testified that when another employee noticed the packaging had inconsistent labeling as to ingredients, his superiors told him it was okay. James Seiter, another former Berkeley warehouse employee, stated he was instructed to move Rovicid in the process of being repackaged, in advance of the FDA inspection. Both Allert and Seiter testified

23

that the repackaged  Rovicid was ultimately put into the company's stock to be sold to customers.  The jury's misbranding verdict is rationally supported on this testimony, and is not contrary to the manifest weight of the evidence.

> **G.    Count  111,  Obstruction  of  the  Food  and  Drug Administration.**

The jury found Defendants Paul Kellogg and Steven Pugh guilty of conspiracy to obstruct the Food and Drug Administration ("FDA"), based on the government's charge that Defendants ordered the removal of misbranded Rovicid from Berkeley facilities, so as to avoid its discovery by the FDA (docs. 1, 377, 381).   The elements the government had to prove on this count were 1) that two or more persons conspired, or agreed, to commit the crime of obstructing an FDA investigation; 2) that the Defendants knowingly and voluntarily joined the conspiracy; and 3) that a member of the conspiracy did one of the overt acts described in the Indictment for the purpose of advancing or helping the conspiracy (doc. 371).

Kellogg argues he should be acquitted because of a failure of proof that he knowingly, intentionally, and corruptly conspired to obstruct FDA proceedings (doc. 395).  Kellogg argues the FDA warehouse inspection cannot rationally constitute a "proceeding."   Next, Kellogg offers a review of portions of the trial transcript, framing it to support the view that he was not included in emails concerning what to do with the Rovicid, and that the statement he made to Greg Cossman that "we need to get rid of

24

it," meant that he intended for the Rovicid to be destroyed, as opposed to moved out of the warehouse (<u>Id</u>.). Finally, Kellogg argues that the government failed to prove beyond a reasonable doubt, consistent with the instructions provided to the jury, that the removal of the Rovicid had or would have had the natural or probable effect of interfering with the due administration of justice by the FDA (<u>Id</u>.). Kellogg argues this is the case because he intended to trash the old Rovicid, and that in any event, the removal and return of the Rovicid did not interfere with the FDA's inspection because the removal took place during the evening of May 13, 2004, after the FDA had already collected Rovicid samples earlier in the day (<u>Id</u>.).

The Court has already found that the conspiracy charge in Count 111 has no "agency proceeding" requirement (doc. 247). The jury was not charged with an instruction to make such a finding, and Kellogg's argument on this point is without merit. Next, the Court finds the jury could have viewed, and obviously did view, Kellogg's statement "get rid of it" as an order to move the Rovicid out of the warehouse, as opposed to an order to destroy it. The jury makes factual determinations and draws inferences. Here, it was not irrational for the jury to interpret the statement as it obviously did, based on the totality of the evidence before it, including Mike Wagner's testimony that he heard Kellogg tell Jim Teegarden to have someone "get that Rovicid out of there."

25

Kellogg's final argument—that the removal and return of Rovicid did not in fact impede the FDA investigation--also fails. Testimony presented to the jury showed that the FDA returned to the Duff road warehouse on May 14, after the removal of the Rovicid. In fact, the FDA's investigation continued until the following Monday.   The government argues, and the Court agrees, that should the Rovicid had remained in the warehouse, the FDA might have been able to discover the misbranding issue on May 14.

Moreover, the Court finds that the jury's verdict is consistent with the instruction that the removal of the Rovicid "would have had" the natural and probable effect of interfering with the FDA's inspection.   The Court instructed the jury that it is a crime for two persons to conspire, even if they never actually reach their goal (doc. 371). Here, there was adequate evidence for the jury to conclude that Kellogg agreed with others to hide the Rovicid and ordered it to be moved.   The jury could have rationally concluded that such agreement would have had the effect of interfering with the FDA's inspection.   The conspiracy was not so far-fetched or distanced in time from the FDA inspection that it could have had no possibility of interfering with it.

Defendant Pugh similarly challenges the jury's verdict under nearly identical theories (doc. 400).  He argues that none of the Rovicid removed from the warehouse was misbranded so the government failed to prove an overt act (Id.).   However, such

assertion contradicts James Seiter's testimony that under Pugh's direction, Seiter loaded Rovicid in the process of being repackaged into a rental truck to be taken away. Based on such testimony, the jury could rationally arrive at its conclusion that Pugh's directive resulted in the removal of misbranded Rovicid.

The Court rejects outright Pugh's argument that because he was not convicted of misbranding, he cannot be convicted of conspiracy to obstruct the FDA. The elements of the two offenses are distinct. The Court similarly rejects Pugh's argument that the FDA's inspection did not constitute a pending proceeding, for the same reasons expressed above in relation to Defendant Kellogg.

Although Pugh argues there is no evidence that he and Kellogg agreed to commit a crime, the testimony of Greg Cossman shows that Kellogg's directive to "get rid of it" was relayed to Pugh, who instructed Seiter and Allert to move the Rovicid away from the warehouse. Cossman further testified that Pugh explained to him after the Rovicid was returned to the warehouse, that Pugh had hid it from the FDA inspectors. James Kinmon testified that Pugh directed him to drive the truck containing the Rovicid to another warehouse. The Court finds the government's position well-taken that a rational jury could view this evidence to show that Pugh, Cossman, and Kellogg all agreed to remove the Rovicid because of the FDA inspection. Such agreement constitutes a conspiracy, and the manifest weight of the evidence does not militate against

27

such finding.

**H.  Count 112, Obstruction of the Federal Trade Commission.**

The jury found Defendants Steve Warshak and Kellogg guilty of conspiracy to obstruct the Federal Trade Commission ("FTC")(docs. 373, 377).  The Court instructed the jury that in order to find Warshak and Kellogg guilty on this count, they had to find beyond a reasonable doubt that Warshak and Kellogg knowingly, intentionally, and corruptly conspired to create two trusts, the Carrie Warshak Q-Tip Trust, and the Warshak 2004 Gift Trust, for the purpose of and with the intent to influence, obstruct, or impede an FTC proceeding (doc. 371).

Warshak contends no rational jury could find the trusts were created to impede the FTC by hiding and concealing and attempting to conceal funds from the FTC (doc. 331).  Warshak argues the evidence shows that Venable attorneys suggested he set up the trusts, both of which bore the Warshak name (Id.).  Evidence at trial showed that Warshak urged that everything be kept simple and objected to everything being tied up in an irrevocable trust (Id.).  At the time the trusts were created, Warshak argues, he had assets far beyond the anticipated amount needed to settle with the FTC (Id.).  Moreover, he and Kellogg both argue, before the trusts were finalized, Kellogg told William Bertemes the trusts would have to be disclosed to the FTC, and Kellogg sent him FTC disclosure forms (docs. 331, 395).  Under advice of Venable, they argue, the

28

forms were not filed until May 2005, because neither Berkeley nor Warshak intended to raise an inability to pay defense (<u>Id</u>.).

Kellogg further argues that there is no evidence that the creation and funding of the trusts interfered with any FTC proceeding (doc. 395). Under all of these facts, argue Warshak and Kellogg, the evidence is insufficient to support the jury's verdict (<u>Id</u>.).

The government responds that the testimony of William Bertemes, alone, is sufficient to support the jury's verdict (doc. 439). Bertemes testified that Kellogg was the source of his knowledge that the trusts were designed to hide assets from the FTC (<u>Id</u>.). The government argues that Kellogg saw the urgency of the situation given the pending FTC investigation, evidence showed he recommended higher funding of the trusts the same day the FTC requested Warshak's personal financial information, and Kellogg opined that the trusts should not be disclosed to the FTC (<u>Id</u>.). The government further argues that the FTC's complaint sought consumer redress, which could have been substantial given Berkeley's 2004 sales in excess of $200 million (<u>Id</u>.). The jury could have viewed the transfer of over $14 million into irrevocable trusts as making it more difficult for the FTC to recover funds for a redress settlement or judgment (<u>Id</u>.). Finally, the government argues Defendants did not file the FTC disclosure forms despite the FTC's having informed Venable attorneys that their position was

wrong that no disclosure was necessary, and Defendants only did so after Warshak's assets were frozen (<u>Id</u>.).

The Court finds sufficient evidence in the testimony of William Bertemes to support a rational verdict against Defendants Warshak and Kellogg as to obstruction of the FTC.  Evidence in the record supports the conclusion that the creation of the trusts would have had the natural or probable effect of interfering with the FTC's proceeding.  Warshak's claim that he wanted to keep the trusts simple does not adequately counterbalance the fact that he and Kellogg established these trusts during what Kellogg described as a "window of opportunity."

## III.  Other Challenges to the Verdict

### A.  Improper Comments made during Closing Argument

Defendants argue that the U.S. Attorney improperly vouched for the truth of the government's witnesses and the integrity of the government's case (doc. 405, 452).  In rebuttal to Defendants' closing argument that investigating agents abused their authority and coerced the cooperating witnesses to testify, the U.S. Attorney made comments to the effect that Defendants would have the jury believe that the real conspiracy in the case was one of all of the government agents and the U.S. attorneys, who held a vendetta against the Defendants.  The U.S. attorney stated, "apparently we ourselves are abusive and horrible and evil people, according to the defense attorneys," and closed, "it is kind of

30

preposterous that we would all get together and lie to do this, that this case is somehow worth everything—our reputations, our lives, our families—just because convicting this guy or these people is so important to us." At another point in closing the attorney asked rhetorically, "how many lies have you heard from the government? None." Finally, as to the cooperating witnesses, the attorney stated, "They certainly aren't going to get a break in their sentence if they lie."

Defendants quote <u>United States v. Jackson</u>, 473 F.3d 660, 670 (6th Cir. 2007), for the proposition that "[i]mproper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility, thereby placing the prestige of the United States Attorney behind that witness" (doc. 452). Defendants argue the attorney's remarks in question improperly vouched not for the credibility of a single witness but for the credibility and honesty of the entire case (<u>Id</u>.).

Defendants also argue the prosecutor improperly expressed his personal opinion regarding the guilt of the Defendants in contravention of <u>Slagle v. Bagley</u>, 457 F.3d 501, 523 (6th Cir. 2006), when he opined that the Defendants were weak, sought personal gain at the expense of consumers and thought it was okay to lie to banks, stating, "Do I believe they believe that? Yes" (<u>Id</u>.). In addition, Defendants complain, the prosecutor improperly

offered his personal interpretation about the content of recorded conversation offered into evidence (Id.). Defendants further argue they are entitled to a new trial because the U.S. Attorney injected his military experience into closing argument, so as to pass a negative judgment on Defendants (Id. citing United States v. Thompson, 192 Fed Appx. 488, 491 (6th Cir. 2006)(prosecutor improperly related personal experience to jury).

Defendants further accuse the prosecutor of misstating the evidence when he essentially stated that all of the credit card charges Berkeley made were unauthorized. Defendants complain the prosecutor misled the jury into believing the government had disclosed damaging evidence before the trial regarding Shelley Kinmon's statement that Steven Warshak asked her to destroy evidence on her computer. Defendants also argue the prosecutor improperly shifted the burden of proof with statements to the effect that it is not up to the victim to prove they were not deceived, and that no one in Berkeley defended the statistics Teegarden testified he fabricated as true (Id.). Finally, Defendants argue the government improperly suggested that evidence not presented to the jury proved the Defendants' guilt, that the cooperator's guilty pleas were evidence of Defendants' guilt, and that the prosecutor misstated the law in a number of respects (Id.).

The government responds that Defendants failed to object

on any of these grounds during closing arguments.  The government further argues Defendants made personal attacks in their closing argument against both government counsel and case agents, and put the prosecution's intent into issue.  As such, the government argues, its attorney was entitled to respond.  The military references, argues the government, in no way vouched for any witness or the prosecution in general.

The Court heard the lion's share of Defendants' objections subsequent to the government's closing argument, and in response gave the jury a curative instruction, that in its view, remedied any problems.[4]  The Court further notes that it instructed

---

[4] The Court stated to the jury: "First, nothing any lawyer said during the course of this trial or in opening or closing statements concerning the law applicable to this case should be accepted by you, as only I, as the presiding judge, will provide you with the law that you will apply to the facts as you find them.  Second, no remarks, statements, or questions by counsel in the course of this case or in the opening statement or closing argument may be considered by you as evidence.  Of course, counsel may argue what they believe the evidence demonstrated, but the evidence for you to consider is only the sworn testimony that came from the witness stand, the exhibits entered into evidence and any stipulations agreed to by the parties.  Third, it is not appropriate for lawyers to vouch for the credibility of a witness, that is, to express a personal opinion about the truth of a witness' testimony.  That is for you to decide.  Fourth, you're to disregard any personal opinions or personal backgrounds of counsel.  And finally, fifth, there have been references to the grand jury, and as I have instructed you earlier, the role of the grand jury is to determine whether a crime has been committed and whether there is probable cause to charge someone with committing that crime.  The charge is called an indictment and is merely an accusation. . .Your job is to determine if the defendants are guilty beyond a reasonable doubt of any of the crimes they've been charged with in the indictment."

33

the jury on numerous occasions that the closing arguments did not
constitute evidence, and that the jury would have to rely only on
the Court's instructions as the final authority as to the law.
Defendants' various complaints strike the Court as overblown. As
previously stated, the government proffered voluminous amounts of
evidence during a six-week long trial. The Court simply does not
find credible the suggestion that errors in closing argument so
infected the jury's understanding of the case that they did not
reach a rational conclusion. The Court has scrutinized the
evidence supporting every charge in the Indictment, and as it has
expressed above, the jury had a rational basis to arrive at its
conclusions that Defendants were involved in a massive consumer
fraud conspiracy and the other charged offenses.

The Court finds its conclusion bolstered by the Sixth
Circuit's recent decision in <u>Johnson v. Bell</u>, No. 04-5377, 2008
U.S. App. LEXIS 9234, *33-35 (6th Cir. April 29, 2008). Although
discussing the analysis of a claim for prosecutorial misconduct on
habeas review, the principles properly guide the Court in
evaluating Defendants' current arguments. The relevant question in
evaluating prosecutorial misconduct is "whether the prosecutor's
comments so infected the trial with unfairness as to make the
resulting conviction a denial of due process" <u>Id</u>. <u>citing</u> <u>Darden v.
Wainwright</u>, 477 U.S. 168, 181 (1986)(internal quotation marks
omitted). "To satisfy this standard, the conduct must be both

34

improper and flagrant" <u>Id</u>. <u>citing</u> <u>Broom v. Mitchell</u>, 441 F.3d 392, 412 (6th Cir. 2006).   The Court first makes a determination if the conduct was improper, and then, if so, considers four factors to determine if it was flagrant: 1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant, 2) whether the remarks were isolated or extensive, 3) whether the remarks were deliberately or accidentally made, and 4) the total strength of the evidence against the defendant.   <u>Id</u>. Under this analysis the Court concludes that to the extent any of the prosecution's comments may have bordered on the improper, his conduct was not flagrant so as to warrant dismissal.   The Court finds little likelihood that the prosecutor's remarks misled the jury, particularly in light of the total strength of the evidence against the Defendants.

**B.   Grand Jury References**

Defendants also argue the prosecution made the improper argument that the Indictment provided evidence of guilt (doc. 452). Defendants quote a portion of the closing argument in which the prosecutor stated the grand jury made a probable cause determination as to 112 counts and then said, "these people committed these crimes, that's what that means."   Later, the prosecutor stated "the Grand Jury believed they committed crimes." Defendants quote <u>United States v. Bess</u>, 593 F.2d 749, 754 (6th Cir. 1974) for the proposition that "it is always improper for a

35

prosecutor to suggest that a defendant is guilty merely because he is being prosecuted or has been indicted" (doc. 452).

The government responds that its passing references to the grand jury in no way suggested the Grand Jury's indictment proved Defendants' guilt.  Although the Court agrees that the prosecutor's remarks came closer to an improper suggestion than to a passing reference, the Court also believes that taken in context such remarks do not constitute flagrant prosecutorial misconduct. The Court repeatedly instructed the jury that the Indictment was merely an accusation and the government bore the burden to prove every element of every crime beyond a reasonable doubt.  The Court offered its curative instruction immediately after the remarks were made and before the jury received its instructions.  The Court finds no prejudice meriting the order of a new trial.

## IV. Forfeiture Issues

### A.  Motion to Vacate Preliminary Order of Forfeiture

Defendants move the Court to vacate its Preliminary Order of Forfeiture (doc. 418), that the Court entered on March 7, 2008 (doc. 419).  Defendants argue they should have an opportunity to be heard regarding the permissible extent of the forfeitures in advance of such order (Id.).

The government responds that the Preliminary Order does not become final until sentencing, and that such Order allows it to preserve the availability of the assets that have not been

36

previously seized (doc. 430, <u>citing</u> Fed. R. Crim. P. 32.2(b)(3)). The Order also allows for notice to third parties, so that they may petition the Court concerning any alleged interests in the property (<u>Id</u>. <u>citing</u> 21 U.S.C. § 853(n)(2)). The government argues that should the Court determine at the May 14, 2008 hearing that any of the property in question is not subject to forfeiture, the Court can order such property returned (<u>Id</u>.).

The Court finds the government's position well-taken in all respects, and denies Defendants' motion to vacate.

**B. Defendant Steven and Harriet Warshak's Motions to Set Aside Forfeiture Verdicts or For a New Trial on Forfeiture Issues.**

In its forfeiture verdicts, the jury found by a preponderance of the evidence that there was a substantial nexus between thirty-three of Defendants' assets and the crimes for which Defendants Steven Warshak, Harriet Warshak, Berkeley, and TCI had been convicted (docs. 387, 389). The jury found such assets were derived from proceeds traceable to the unlawful activity, as well as finding the assets were involved in a transaction or attempted transaction of money laundering (<u>Id</u>.).

**1. Defendants' Motions to Set Aside Verdicts**

Defendants now move the Court to set aside the forfeiture verdicts as unsupported by the evidence (docs. 413, 415).[5]

---

[5]Harriet Warshak complains that there was no special verdict that criminal conduct permeated Berkeley from 2004 to 2006. The Court notes that no Defendant requested such a special verdict

Specifically as to the 5150 Rollman real estate, Defendants argue Steven Warshak purchased this property in 1999, two years prior to the date on which the conspiracy was alleged to have begun (doc. 413).  They argue therefore there could have been no nexus between the purchase and the offenses of conviction (<u>Id</u>.).  Defendants further argue that any mortgage payments made during the period of the Indictment were not proven to be the proceeds of specified unlawful activity (<u>Id</u>.).  The government's expert, Jerome Simpson, argue Defendants, traced the funds to Berkeley, but not to any fraudulent conduct (<u>Id</u>.).  Defendants argue similarly as to the downpayments they made on the property at 5758 San Elijo in 2004, vehicles, bank acounts, investment accounts, an insurance policy, and accounts receivable (<u>Id</u>).

The government responds that it proved in the guilt phase that Berkeley proceeds during the time of Indictment were fraudulent, and it need not prove what portion of such proceeds were fraudulent (doc. 444).  Under the applicable forfeiture statutes, the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 981(a)(1), it argues forfeiture is not limited to the net gain or profit realized from the offense (<u>Id</u>.).  As for the property at 5150 Rollman, it argues that Defendants refinanced the property during the time of the conspiracy, and made payments

during either of the lengthy charging conferences or in any of the submitted proposed special verdict forms.

during the time of the conspiracy. (Id.).

The Court takes the government's view that the jury was presented with adequate evidence to rationally link Berkeley proceeds to the various targeted assets.  As for Steven Warshak's gift of one million dollars to Harriet Warshak, the Court agrees with the government's position that the relation back doctrine precluded the transfer of good title (doc. 449, citing 18 U.S.C. § 981(f)).  In conclusion, the Court finds no basis therefore to set aside the forfeiture verdicts that such assets were derived from specified unlawful activity.

Defendants similarly challenge the jury's money laundering forfeiture verdicts (doc. 413).  Defendants argue their mortgage payments did not facilitate money laundering because they were open and straightforward payments, and even if every penny was attributed to unlawful activity, only such money traceable to such activity is forfeitable (Id.).

In its February 22, 2008 Order concerning the jury's forfeiture instruction, the Court already expressed its view through the instruction it approved, that the commingling of legitimate and illegitimate funds in an account can result in the forfeiture of the entire amount (doc. 355).  Property "involved" in a money laundering offense can be subject to forfeiture.  United States v. Huber, 404 F.3d 1047 (8th Cir. 2005).  The Court further finds a rational basis to the conclusion that Defendants'

transactions facilitated the laundering of fraud proceeds from the company, and transformed them into real estate and other property. For these reasons, the Court finds no merit to Defendants' motions to set aside the forfeiture verdicts.

### 2. Defendants' Motions for a New Trial on Forfeiture

Defendants move the Court for a new trial on forfeiture, arguing they were denied the right to present evidence during the forfeiture phase of the trial (doc. 413).  Defendants intended to produce testimony of Berkeley employees as to Berkeley's marketing practices from 2003 to 2005, and as to its disclosure of the continuity program to customers (<u>Id</u>.).  The Court granted the government's objection on the ground that Defendants were relitigating the underlying criminal convictions, and excluded the testimony (<u>Id</u>.).

Defendants argue the Court erred because its efforts in presenting such testimony was to show there could be no nexus between criminal proceeds and the targeted assets (<u>Id</u>.).  In Defendants' view, they were attempting to show that their revenues from 2003 to 2006 were from legitimate sales of Berkeley products (<u>Id</u>.).  The exclusion of such evidence, in their view, was a highly prejudicial error meriting the granting of a new trial (<u>Id</u>.).

The government argues the theme of Defendants' defense during the entire criminal case was that Berkeley had happy, satisfied customers, that they suffered growing pains and computer

40

glitches, and that not every sale was based on fraud (doc. 443). It argues the Defendants' additional attempt during the forfeiture phase to decriminalize their activities was properly rejected by the Court (Id.).

The Court finds the government's position well-taken, and finds no basis to grant Defendants' a new forfeiture trial.

### C.  Defendants' Notice of Appeal

Defendants filed a Notice of Appeal on March 17, 2008 based on their concern that they need to comply with United States v. Christunas, 126 F.3d 765 (6th Cir. 1997) (doc. 434).  Defendants indicate they have no intention of divesting the Court of jurisdiction by filing the Notice (Id.).  For the record, the Court finds Christunas distinguishable as in this case there rest issues to be determined as to forfeiture.  The Court therefore maintains jurisdiction over this matter regardless of Defendants' Notice.

### V. Conclusion

For the reasons indicated herein, the Court DENIES Defendants Steven Warshak, Berkeley Premium Nutraceuticals and TCI Media's Motion for Judgment of Acquittal or for New Trial (docs. 405, 331), DENIES Defendant Harriet Warshak's Motion for Judgment of Acquittal or for New Trial (doc. 395), DENIES Defendant Paul Kellogg's Motion for Judgment of Acquittal or for New Trial (doc. 395), DENIES Defendant Steven Pugh's Motion for Judgment of Acquittal (doc. 400), DENIES Defendants Steven Warshak, Berkeley

and TCI Media's Motion to Vacate Preliminary Order of Forfeiture (doc. 419), DENIES Defendants Steven Warshak, Berkeley, and TCI Media's Motion to Set Aside Forfeiture Verdicts (doc. 413), DENIES Defendant Steven Warshak, Berkeley, and TCI Media's Motion for New Trial on All Forfeiture Issues (doc. 414), and DENIES  Defendant Harriet Warshak's Motion to Set Aside Forfeiture Verdicts or for New Trial on All Forfeiture Issues (doc. 415).

       SO ORDERED.


Dated: May 13, 2008       s/S. Arthur Spiegel
                    S. Arthur Spiegel
                    United States Senior District Judge